OPINION
{¶ 1} Appellant, C.W. ("appellant"), appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that, among other things, divested him of all parental rights and granted permanent custody of D.W. and M.W. to Franklin County Children Services ("FCCS"). For the reasons set forth below, we affirm the trial court's judgment. *Page 2 
 {¶ 2} By complaint filed on April 23, 1998, FCCS alleged that D.W., who was three years old at the time, and M.W., who was two years old at the time, were neglected and dependent children. In its complaint, FCCS claimed that in March 1998 police officers found the children in a home without supervision. FCCS further claimed, among other things, that the children's mother abused crack cocaine, was homeless, and never adequately parented the children. The complaint also alleged that child-endangerment charges had been brought against the children's putative father. The trial court, through a magistrate, thereafter granted temporary custody to FCCS, and the children were placed in a certified family foster home.
 {¶ 3} After finding that the circumstances that gave rise to the removal of the children from the home had not been sufficiently alleviated, by judgment entry filed on June 29, 1998, the trial court determined that the children were neglected and dependent minors as defined in former R.C. 2151.03(A) and 2151.04(C), respectively. The trial court then temporarily committed the children to the custody of FCCS.
 {¶ 4} In October 1998, claiming that appellant had cooperated with FCSS and had completed all case-plan objectives, FCCS moved the trial court to terminate FCSS's temporary custody of the children and to award legal custody to appellant. By entry filed on January 21, 1999, the trial court, among other things, terminated the temporary court commitment of the children to FCCS, awarded legal custody to appellant, placed D.W. and M.W. under the protective supervision of FCSS, and decided to exercise continuing jurisdiction over the matter.
 {¶ 5} In March 1999, claiming, among other things, that appellant was employed and had provided for the needs of the children, that the whereabouts of the children's *Page 3 
mother was unknown, and that the mother had stopped all contact with FCCS, FCCS moved to terminate court-ordered protective supervision of the children. The trial court thereafter granted FCCS's motion and terminated court-ordered protective supervision. The trial court, however, maintained its wardship of the children, and also maintained its award of legal custody to appellant.
 {¶ 6} Claiming that D.W. reported that appellant inflicted "a large handprint shaped bruise" to his face, on November 22, 2000, FCCS moved the trial court to exercise continuing jurisdiction and sought to be joined as a party. FCCS further requested, among other things, that the trial court order appellant to attend anger management counseling and parent education.
 {¶ 7} The trial court, through a magistrate, subsequently found, among other things, that continued placement of the children in their home was consistent with their best interests only if FCCS investigated and monitored the circumstances of the home. The trial court, through the magistrate, ordered FCCS to fully investigate the home and provide appropriate services and protective supervision. At the request of the parties, the trial court later dismissed FCCS's November 22, 2000 motion.
 {¶ 8} On April 20, 2004, FCCS again moved the trial court to exercise continuing jurisdiction and also moved for modification of custody. In this motion, FCCS claimed that appellant struck D.W. with an open hand on the left side of his face, which resulted in bruising and scratches. FCCS further alleged that, as a result of this incident, appellant had been charged with domestic violence and assault.
 {¶ 9} The trial court, through a magistrate, thereafter issued an emergency care order that directed FCCS to temporarily care for the children. Later the trial court, through *Page 4 
a magistrate, granted temporary custody of D.W. to FCCS and returned custody of M.W. to appellant The trial court, through the magistrate, however, ordered FCCS to fully investigate the home and the needs of M.W. and to provide appropriate services and protective supervision. By entry filed on May 24, 2004, after finding that continued placement of M.W. in the home was contrary to her welfare and best interest, the trial court, through a magistrate, granted temporary custody of M.W. to FCCS. That same day, the trial court, through a magistrate, ordered appellant to submit to a psychological evaluation.
 {¶ 10} In June 2004, FCCS moved the trial court to set child support and to determine the responsibility of the parents to pay reasonable and necessary medical expenses of the children. Approximately one month later, in July 2004, after conducting a hearing, the trial court, through a magistrate, denied a request to return the children to appellant, and ordered FCCS to investigate possible placement of the children with relatives.
 {¶ 11} After conducting a hearing concerning FCCS's April 20, 2004 motion, by entry filed on December 14, 2004, the trial court determined that the children's removal from home continued to be necessary because the circumstances that gave rise to their removal had not been sufficiently alleviated. The trial court therefore granted FCCS's motion and terminated appellant's legal custody of D.W. and M.W. The trial court further directed FCCS to seek permission from the guardian ad litem before allowing unsupervised visitation by the children's parents.
 {¶ 12} On March 30, 2005, claiming that appellant and the children's mother failed to substantially change the conditions that caused the children to be placed outside the *Page 5 
home despite FCCS's reasonable and diligent efforts to assist each parent, FCCS moved the trial court to terminate all parental rights and to grant permanent custody of D.W. and M.W. to FCCS.
 {¶ 13} Approximately one month later, on April 25, 2005, Dolly Hart, the putative paternal grandmother of the children who was not a named party to the action, moved the trial court for legal custody of the children and for visitation rights pending a final hearing. At a hearing, the trial court denied a request to join Ms. Hart as a party to the proceedings. (Tr., July 7, 2005, at 4.)
 {¶ 14} In May 2005, after conducting a hearing, the trial court ordered, among other things, that appellant's visitation with the children should be maintained, that he should not discuss custody proceedings with the children, and that, if he violated this directive, then future visitation would be suspended. The trial court further ordered FCCS to investigate placement of the children with other family members.
 {¶ 15} About one month later, on June 8, 2005, after holding a hearing, the trial court ordered appellant, M.W., and M.W.'s mother to submit to genetic testing to establish whether appellant was the biological father of M.W. The next day, the trial court ordered the parties to participate in a mediation program, which ultimately ended with no agreement.
 {¶ 16} In December 2005, after genetic testing excluded appellant as the father of M.W., FCCS moved the trial court for a continuance so that anonymous defendants could be served by FCCS. That same month, on December 14, 2005, FCCS filed an amended motion for permanent custody, and appellant moved the court for legal custody of M.W. *Page 6 
 {¶ l7} By entry filed on December 21, 2005, the trial court ordered FCCS to facilitate anger management classes for appellant and also ordered him to complete a psychological evaluation and to comply with any recommendations from the evaluation.
 {¶ 18} After discovering that D.W. might be of Native American descent, in March 2006, FCCS filed a notice of permanent custody proceedings pursuant to the Indian Child Welfare Act of 1978, Pub. Law95-608, 92 Stat. 3069, and also later filed amended notices of permanent custody proceedings. See, generally, Section 1912, Title 25, U.S. Code.
 {¶ 19} In May 2006, claiming that D.W. was exhibiting serious behavior problems in school and in the foster home, and claiming that appellant had failed to consent to allow additional testing so that D.W.'s eligibility for placement in a classroom for severely emotionally disturbed children could be determined, FCCS moved the trial court for a shelter-care hearing and for alternative disposition. After the matter was later resolved, this motion was dismissed at FCCS's request.
 {¶ 20} In June 2006, the children's guardian ad litem filed a report, wherein he stated that both M.W. and D.W. had sufficiently reached levels of developmental maturity to meaningfully make known their wishes and desires concerning issues of permanent placement, reunification, and adoption. According to the guardian ad litem, M.W. had stated a wish to be reunified with appellant or other family members and did not want to be placed in permanent custody of FCCS for purposes of adoption. The guardian ad litem also reported that D.W. had stated a wish to be reunified with his father or other family members; however, D.W. had also stated on several occasions that he did not want to visit with his father and only wanted to return to his father's care after his father *Page 7 
"[got] better." Despite the children's wishes, the guardian ad litem recommended that it was in the children's best interest for them to be permanently committed to the custody of FCCS for purposes of adoption.
 {¶ 21} On July 24, 2006, the trial court held an in camera hearing with D.W. and the guardian ad litem. In this hearing, D.W. informed the trial court that he did not want to be adopted. (Tr., July 24, 2006, at 6.) D.W. also informed the trial court that in the past he was "happy and scared at the same time" when he lived with appellant. Id. at 10. One month later, on August 24, 2006, the trial court held an in camera hearing with M.W. and the lay guardian ad litem. At this hearing, M.W. voiced no preference as to possible outcomes of the case. (Tr., Aug. 24, 2006, at 15.)
 {¶ 22} After holding a hearing to consider FCCS's amended motion for permanent custody and termination of all parental rights, the trial court issued an order that divested the parents of any and all parental rights and privileges and granted permanent custody to FCCS. Specifically, by judgment entry filed on May 31, 2007, the trial court found, among other things, that by clear and convincing evidence appellant was an alleged father and had standing in the case as a prior custodian in kinship, not as a known father.[1] The trial court further found by clear and convincing evidence that the children's mother abandoned the children, and that, despite reasonable case planning and diligent *Page 8 
efforts by FCCS, appellant failed to remedy the problems that required the children to be placed outside the home. The trial court also found that D.W. was in need of more stability, structure, nurturing, and stimulation than that which appellant had demonstrated, and that appellant had demonstrated an inability to meet D.W.'s needs when D.W.'s behavior was in conflict with appellant's wishes.
 {¶ 23} From the trial court's judgment divesting appellant of any and all parental rights and awarding permanent custody of M.W. and D.W. to FCCS, appellant now appeals and assigns the following four errors for our consideration:
 Assignment of Error Number One: Permanent custody is inappropriate because FCCS did not make a reasonable effort to reunite the family by diligently providing father with required services.
 Assignment of Error Number Two: The trial court did not address all the required statutory factors regarding the best interests of the children.
 Assignment of Error Number Three: The judgment awarding permanent custody is not supported by clear and convincing evidence.
 Assignment of Error Number Four: The court violated father's right to be present when it proceeded without him on the last day of the hearing.
 {¶ 24} The right to raise a child is a basic and essential civil right. In re J.Z., Franklin App. No. 05AP-8, 2005-Ohio-3285, at ¶ 9, citing In re Hayes (1997), 79 Ohio St.3d 46, reconsideration denied,79 Ohio St.3d 1492. Accordingly, a parent must be given every procedural and substantive protection that the law allows prior to the termination of parental rights. Id. See, also, Hayes, at 48 (observing that "[p]ermanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case'"). (Citation omitted.) *Page 9 
 {¶ 25} "[T]o terminate parental rights, the movant must demonstrate by clear and convincing evidence that (1) termination is in the child's best interests, and (2) one of the four factors enumerated in R.C.2151.414(B)(1) applies." In re J.Z., at ¶ 10, citing In re Gomer, Wyandot App. No. 16-03-19, 2004-Ohio-1723, appeal not allowed,102 Ohio St.3d 1473, 2004-Ohio-2830. "Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established." In re J.Z., at ¶ 10, citing In re Abram, Franklin App. No. 04AP-220, 2004-Ohio-5435, appeal not allowed, 104 Ohio St.3d 1441,2004-Ohio-7033. However, "[clear and convincing evidence] does not mean clear and unequivocal evidence and does not require proof beyond a reasonable doubt." In re J.Z., at ¶ 10, citing In re Abram.
 {¶ 26} "An appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence." In re Siders
(Oct. 29, 1996), Franklin App. No. 96APF04-413, citing In reBrofford (1992), 83 Ohio App.3d 869, 876-877; In re Hiatt (1993),86 Ohio App.3d 716, motion to file notice of appeal instanter denied,67 Ohio St.3d 1406. See, also, In re Nibert, Gallia App. No. 03CA19,2004-Ohio-429, at ¶ 15-16.
 {¶ 27} Appellant's first assignment of error claims that FCCS did not make a reasonable effort to reunite the family because it failed to diligently provide appellant with required services and, as a consequence, the trial court erred by granting permanent custody in favor of FCCS. We cannot agree.
 {¶ 28} R.C. 2151.414(B)(1) provides in part:
 Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in *Page 10 
the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 * * *
 (d) The child has been in the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
See, also, R.C. 2151.413(D)(1) (requiring a public children services agency to move for permanent custody "if a child has been in the temporary custody of one or more public children service agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999").
 {¶ 29} Here, the trial court found that D.W. and M.W. had been in FCCS's custody for 12 months or more during a consecutive 22-month period ending on or after March 18, 1999. On appeal, appellant does not challenge this finding. The trial court also found that granting permanent custody of the children to FCCS was in the children's best interests.
 {¶ 30} In In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104, reconsideration denied, 113 Ohio St.3d 1516, 2007-Ohio-2208, the Supreme Court of Ohio considered, among other things, "`[w]hether a reasonable efforts determination is required in motions for permanent custody filed pursuant to R.C. 2151.413.'" Id. at ¶ 2. In In re C.F., the court "[held] that, except for some narrowly defined statutory exceptions, the state must make reasonable efforts to reunify the family before terminating parental rights. If the agency has not already proven reasonable efforts, it must do so at the hearing on a motion for permanent custody. However, the specific requirement to make reasonable efforts that is *Page 11 
set forth in R.C. 2151.419(A)(1) does not apply in an R.C. 2151.413
motion for permanent custody." Id. at ¶ 4.
 {¶ 31} "Reasonable" may be defined as "[f]air, proper, or moderate under the circumstances." Black's Law Dictionary (8Ed.Rev.2004) 1293. "When the state intervenes to protect a child's health or safety, `[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed are "reasonable efforts."'" In re C.F., at ¶ 28, quoting Will L. Crossley, Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation (2003), 12 B.U.Pub.Int.L.J. 259-260. See, also, In reC.F., at ¶ 29-35 (discussing that no one section of the Ohio Revised Code addresses the concept of "reasonable efforts").
 {¶ 32} Here, appellant claims that FCCS failed to take credible steps toward reunifying the family while a permanent custody motion was pending before the trial court. To support his claim, appellant points to his testimony wherein he outlined his conflicted experience with FCCS, including FCCS's purported failure to secure a referral for anger management and a psychiatric evaluation.
 {¶ 33} For its part, FCCS disputes appellant's claims. FCCS contends its caseworker provided direction and advice about parenting skills to appellant, provided him with pertinent resource information, attempted to arrange a psychiatric evaluation for appellant, and attempted to accommodate appellant's work schedule when she scheduled visitation appointments.
 {¶ 34} Based upon our review of the evidence, we find that appellant initially seemed to have considered FCCS's actions and the case plan's requirements as *Page 12 
intrusive, unnecessary, and unjustified. FCCS, in turn, seemingly viewed appellant as uncooperative with its efforts to reunite the family. Although FCCS and appellant appear at times to have engaged in a less-than-collaborative approach in achieving a goal of family reunification, we cannot conclude that, "FCCS was merely dragging its feet long enough to satisfy the `12 months out of 22' rule and make permanent custody that much easier to obtain" as appellant claims on appeal. (Appellant's brief, at 18.) Rather, we find the testimony of the FCCS case worker, if believed by the trier of fact, constitutes competent, credible evidence to support a finding that FCCS used reasonable efforts to reunify the family. Under the facts and circumstances of this case, we therefore cannot conclude that FCCS failed to use reasonable efforts to reunite the family by diligently providing the father with required services as appellant claims.
 {¶ 35} Accordingly, we overrule appellant's first assignment of error.
 {¶ 36} Appellant's second assignment of error asserts that the trial court erred because it failed to address all the required statutory factors in its determination of the children's best interests.
 {¶ 37} "A court must conclude by clear and convincing evidence that an assignment of permanent custody is in the best interest of the child."In re Schaefer, 111 Ohio St.3d 498, 2006-Ohio-5513, at ¶ 56, citing R.C.2151.414(E). "The court must consider all of the elements in R.C.2151.414(D) as well as other relevant factors. There is not one element that is given greater weight than the others pursuant to the statute." Id. A trial court, however, "is not required to specifically enumerate each factor under R.C. 2151.414(D) in its decision." In re C.C., Franklin App. No. 04AP-883, 2005-Ohio-5163, at ¶ 53, appeal not allowed,107 Ohio St.3d 1701, 2005-Ohio-6763, citing In re Heyman *Page 13 
(Aug. 13, 1996), Franklin App. No. 96APF02-194. "[Still], there must be some indication on the record that all of the necessary factors were considered." In re C.C., at ¶ 53, citing In re Heyman; In re Hershberger Smith, Allen App. No. 1-04-55, 2005-Ohio-429, at ¶ 28. See, also,In re M.R.D., Franklin App. No. 05AP-324, 2005-Ohio-5705, at ¶ 21;In re G.B., Franklin App. No. 04AP-1024, 2005-Ohio-3141, at ¶ 17.
 {¶ 38} R.C. 2151.414(D) provides:
 In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 39} Appellant claims that the trial court failed to address the children's need for a legally secure permanent placement and that it failed to address whether that type of placement can be achieved without a grant of permanent custody to the agency. *Page 14 
Appellant further claims that the trial court failed to give serious consideration to the other best interest factors. We cannot agree.
 {¶ 40} Here, in its determination regarding the children's best interests, the trial court found, among other things, that after the children were placed outside the home and despite diligent efforts by FCCS to assist the parents, and that appellant "failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the child's [sic] home." (Permanent custody judgment entry, at 8.) The trial court also determined that the children's mother abandoned the children and appellant "failed to remedy the problems of anger and parenting that resulted in a black eye by [D.W.] but more importantly Post Traumatic Stress Disorder which initially caused the children to be removed and failed continuously and repeatedly to do so although services were offered unsuccessfully. The children did not feel safe and had oppositional defiant behavior." Id. at 7. Also, in its factual findings, the trial court observed that "[t]he problems * * * with the children * * * can most certainly be assigned to the 5 1/2 years the children lived with [appellant] immediately prior to April 20, 2004." Id. at 5. The trial court further observed: "Subsequent to April 20, 2004, both children have made significant progress with their trauma issues in their personal behavior, their foster care behavior, and their school behavior and performance. * * * [I]t appears that [appellant] is the cause of the trauma to the children and he has rebuked services intended to help him with his anger. He cannot be the solution through custody for the needs of the child to continue the progress they have made."
 {¶ 41} By concluding that prior to their removal from appellant's home, the children did not feel safe, that the children exhibited oppositional defiant behavior, and that D.W. *Page 15 
had begun to experience post-traumatic stress disorder; and by concluding that appellant had failed to substantially remedy the conditions within his home that caused the children to be removed, and that he "cannot be the solution through custody for the needs of the child to continue the progress they have made[,]" we find that the trial court implicitly considered the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency when it considered the children's best interests.
 {¶ 42} Although it would have been preferable for the trial court to directly discuss the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency, we cannot conclude that the trial court failed to address these factors in its judgment. Accordingly, appellant's claims are not well-taken. Based on our review of the trial court's judgment, we also cannot conclude that the trial court failed to give serious consideration to the other best interest factors as appellant contends.
 {¶ 43} For the reasons discussed above, we overrule appellant's second assignment of error.
 {¶ 44} Appellant's third assignment of error asserts that the trial court's judgment is unsupported by clear and convincing evidence. We disagree.
 {¶ 45} At the hearing regarding FCCS's motion for permanent custody, FCCS proffered the testimony of appellant, as if on cross-examination. At the hearing, appellant testified that, at first he fought against complying with the FCCS case plan because he believed that FCCS should not have removed D.W. and M.W. from his home in the first place, and he believed that he did not need to participate in a case plan. (Tr., Oct. 30, *Page 16 
2006, at 41.) However, appellant testified that he later complied with requirements of the case plan. Id. at 42-43. Appellant testified that he was living with his uncle, his uncle's wife, and his mother at his uncle's home. According to appellant, there were beds for the children at his uncle's home, and the home was equipped with electricity, gas, and water. Id. at 45-46. Appellant further testified that he had been employed as a painter for approximately three months, and that this job sometimes required him to be away from home for two days to weeks at a time. Id., at 53-54; 57. According to appellant, prior to this job, he had been receiving workers' compensation benefits due to an injury he sustained in 2000. Id. at 54-55. Appellant further testified that he has contacted potential childcare providers to care for the children in the event custody of the children was returned to him. Id. at 55. Appellant also testified that he had made arrangements with his employer that would allow him to work closer to home in the future. Id. at 57-58.
 {¶ 46} At the hearing, FCCS suggested that appellant had failed to meet D.W.'s educational needs by refusing to sign paperwork that would have allowed D.W. to be placed in special education classes and by failing to attend meetings with educators. Id. at 66-67. Appellant disputed FCCS' characterization. Rather, appellant claimed that he had not timely received notice of meetings and delayed signing paperwork until he had an opportunity to meet with counselors, psychiatrists and other professionals so that he could have a satisfactory understanding of the circumstances and issues before consenting to different services or treatments. Appellant also testified that he did not want to sign paperwork "because somebody tells me that — this is in the best interest of this child. I mean it — that could say anything." Id. at 67. Appellant further claimed that FCCS had "hindered" him. Id. at 69. Appellant testified that he has not spoken with the *Page 17 
psychiatrists who placed his children on medication, and appellant further testified that, as a matter of principle, he was against medicating the children. Id. at 73-74.
 {¶ 47} On cross-examination, appellant also testified about his conflicting experience with FCCS, including FCCS's purported failure to secure services for him, his attempts at securing assistance from FCCS, and his belief that he satisfactorily completed his case plan, even though he was unsure why some components of the case plan, such as anger management counseling, were required. Id. at 76; 77-78; 85-86; 90-92; 99; 106.
 {¶ 48} Appellant further testified that, as required by the case plan, he met with a psychologist, Dr. Douglas Pawlarczyk, who recommended a psychiatric evaluation to determine whether psychotropic medication was indicated and, if needed, further counseling. (Tr., Oct. 31, 2006, 9-10.) After receiving this recommendation, appellant testified that he attempted to call names on a list that an FCCS caseworker had provided to him; however, according to appellant, this list failed to contain suitable referral sources and took approximately three to four months before he was able to arrange psychiatric follow-up. Id. at 11-13. Appellant eventually was evaluated at another mental health clinic, where, according to appellant, a psychiatrist determined that he did not require medication at that time. Id. at 17.
 {¶ 49} In addition to calling appellant as a witness as if on cross-examination, FCCS also called Shannon Evans, a caseworker with FCCS, as a witness on its behalf. Ms. Evans testified that she first became involved with appellant's family on January 10, 2005; however, according to Ms. Evans, FCCS first became involved with the family in 1996 at the birth of M.W. when both M.W. and her mother tested "positive" for the *Page 18 
presence of marijuana. Id. at 68. Ms. Evans testified that, on December 8, 2004, FCCS received temporary care and custody of M.W. and D.W., and the children continuously have been in FCCS's care since that time. Id. at 71. Ms. Evans further testified that when FCCS moved for permanent custody under an amended motion of December 14, 2005, the children had been in care for about 16 months. Id. at 72.
 {¶ 50} Ms. Evans testified that the children had been placed in separate foster care homes because they could not be adequately managed together due to the intensity of their behaviors. Id. at 73-74. According to Ms. Evans, at one point, before the children were placed in separate foster homes, M.W. was hospitalized at a psychiatric hospital for stabilization due to aggression, destruction of property, and behaviors that included running away from police. Id. at 72-73. Ms. Evans testified that D.W. struggles in school, and has been placed in a special behavioral school due to his behavior and academic needs. (Tr., Nov. 28, 2006, at 95.) Ms. Evans also testified that M.W. struggles with reading and math, works at a slower pace than her classmates, and that her reading level is below her current grade level. Id. at 99-100. According to Ms. Evans, in the past appellant generally had been uncooperative with efforts to secure a more appropriate educational setting for D.W. Id. at 98.
 {¶ 51} Ms. Evans testified that she reviewed case planning with appellant and the children's mother. Under the terms of the case plan, the mother was required to complete, among other things, a drug and alcohol assessment, random urine screens, a complete psychological assessment, and parenting classes. (Tr., Oct. 31, 2006, at 76.) According to Ms. Evans, the children's mother failed to satisfactorily comply with the required case plan. Id. at 81-82. *Page 19 
 {¶ 52} Ms. Evans also testified that, under the terms of the case plan, appellant "was * * * supposed to provide for the basic needs of the children, education to provide [D.W.] with extra help, medical needs for both of the children, housing. He was asked to complete parenting classes, anger management classes and follow through with those recommendations and also demonstrate what he's learned. Parenting classes and to demonstrate what he's learned with those skills and a psychological assessment and follow through with those recommendations." Id. at 76-77.
 {¶ 53} Ms. Evans testified that, although appellant completed the required parenting classes, he failed to satisfactorily demonstrate appropriate parenting skills on a consistent basis during visitations with the children. (Id. at 82-83; Tr., Nov. 28, 2006, at 84.) Ms. Evans also testified that, although appellant eventually completed anger management classes, he was "very resistant to attend the classes." (Tr., Oct. 31, 2006, at 87.) Ms Evans testified: "[He] [d]idn't think he had any issues with anger and didn't see the need [for] them to be completed and indicated that he thought he had completed them at Directions for Youth, which he didn't. So there's just been a lot of run around and a lot of hesitation to actually contact an agency to schedule for a class." Id. at 87.
 {¶ 54} Ms. Evans further testified that although appellant completed anger management classes, she observed that he failed to demonstrate anger management skills. Ms. Evans testified: "[T]here's been several occasions where he does get angry in a visit. His voice will be raised in a visit with the children whether he's talking to the children or talking to me or some incident that the children are talking about, he will become upset." Id. at 88. *Page 20 
 {¶ 55} Ms. Evans also testified that neither the children's mother nor appellant had provided her with documentation indicating that they have secured appropriate housing for the children. Id. at 93. Regarding appellant's housing situation, Ms. Evans testified:
 When they first came into care I believe he was living in an apartment, you know, where the children were removed. From that time he has told me several different apartments he was looking at and going to be moving into, had even talked to the children about where they were moving or he'd shown me a lease in the fall of 2004 and the different types of furniture he was getting, different posters, different paintings, that sort of things. How he was decorating the apartment. I believe he got evicted from that apartment.
 From there he had talked about buying land or fixing up a farmhouse in Delaware. Had — was going to bring paint colors in for the children to pick out for their room.
 Had talked about the children going to Olentangy Schools. He's also mentioned that he has a trailer that was gonna be put on this land and then the most recent where he's told me to send mail and the best place to get a hold of him is what I believe to be his mother's address at * * * [.]
Id. at 94-95.
 {¶ 56} When asked about appellant's work history since April 2004, Ms. Evans testified:
 Prior to this summer I had know [sic] that he had been on disability because of an accident and wasn't able to work. Sometime in the summer he had indicated that he had a job as a painter. He mentioned that he was out of town a lot for his jobs. Had asked to move visitation around to accommodate for these jobs. I asked if I could see some documentation, you know, a work schedule to know what his hours would be and have a legitimate reasons to change them and he's never provided me with anything of that sort.
Id. at 96. *Page 21 
 {¶ 57} Ms. Evans testified that appellant completed a psychological evaluation at Netcare in September 2004. Id. at 98. Following this evaluation, appellant was referred to another mental health center for a psychiatric evaluation; however, according to Ms. Evans, he failed to keep a scheduled appointment. Id. at 99-101. Also, Ms. Evans stated that appellant failed to arrange individual counseling that had been recommended following his psychological evaluation at Netcare. (Tr., Nov. 28, 2006, at 66.) Ms. Evans further testified that her attempts at contacting the doctor that appellant had been seeing related to his workers' compensation case were unsuccessful. Id. at 67-68. Additionally, Ms. Evans testified that, in her opinion, appellant had not completed the case plan's requirement that directed him to complete a psychological evaluation and to follow treatment recommendations based on this evaluation. Id. at 69.
 {¶ 58} Ms. Evans testified that neither appellant nor the children's mother attended an initial case-planning conference or any semi-annual reviews that reviewed the case plan. Id. at 70. When asked whether she believed it would be in the children's best interests to be returned to appellant, even if he had complied with all portions of the case plan, Ms. Evans testified: "No. He doesn't appear to have an understanding or willingness to work with the kids to get them the help that they need." Id. at 106.
 {¶ 59} When asked whether the children's foster families were potential adoptive families, Ms. Evans testified: "Both of them have adopted in the past, it's not out of the question. I know they both have been considering it; however, nothing is set in stone that yes or no that they will or will not adopt. I know in the past they have adopted other children." Id. at 104-105. Ms. Evans also testified that there was a reasonable probability the children could be placed together with an adoptive family. Id. at 105. *Page 22 
 {¶ 60} On cross-examination, although Ms. Evans admitted to a characterization that appellant had animosities toward FCCS, Ms. Evans denied that his acrimony toward FCCS negatively colored FCCS's responses toward him. (Tr., Apr. 25, 2007, at 20-21.) When asked whether appellant was "impossible to work with," Ms. Evans testified: "I wouldn't say impossible. I'd say he's more difficult than other client's [sic] to work with." Id. at 25. On cross-examination, when asked whether appellant had demonstrated that he was "adjustable" based on his response to the case plan, Ms. Evans testified that "[h]e's minimally adjusted after, you know, some things have been court ordered for him to do and some things he's still not following." Id. at 27. On redirect examination, Ms. Evans also testified about appellant's missed visitation appointments, id. at 29-36; his inappropriate comments during visitation, id. at 37-38; and an incident in which he made threatening statements to Ms. Evans, id. at 41-44.
 {¶ 61} Besides calling, as on cross-examination, appellant and Ms. Evans, as witnesses, FCCS also called Cheryl Kerr, a licensed professional clinical counselor, to testify on FCCS's behalf.
 {¶ 62} Ms. Kerr testified that she is an outpatient psychotherapist who specializes in trauma and that the majority of her clients are children and adolescents. (Tr., Nov. 28, 2006, at 14.) Ms. Kerr testified that "[m]ost of the clients that I see have a childhood history of abuse, neglect, traumatic experiences that they still have symptomology from." Id. at 15. At the hearing, FCCS offered Ms. Kerr as an expert witness in the field of *Page 23 
trauma. Over appellant's objection, the trial court found Ms. Kerr to be an expert with some reservations.[2]
 {¶ 63} Ms. Kerr testified that since mid-May 2006, she had been D.W.'s therapist. Id. at 20. According to Ms. Kerr, prior psychological testing of D.W. indicated that D.W. had dissociative disorder. Id. Ms. Kerr testified without objection:
 [D.W.] is very easily triggered by any loud noises, any angry voices. He either becomes quite regressed and tearful, and hiding under a chair or he becomes very aggressive. So we've talked about how to stay grounded and not get triggered by external events. We've talked briefly about skills that he could use in school to try to stay out of trouble. He was getting into a lot of fights and having a lot of difficulties with school. We mostly just been working on daily functioning types of things at this point. He continues to be pretty volatile and reactive.
Id. at 22.
 {¶ 64} Mr. Kerr further testified: "[D.W.] certainly has post-traumatic stress disorder and a dissociative disorder, probably dissociative identity disorder. * * * Post-traumatic stress disorder, [D.W.] has intrusive thoughts, flashbacks, nightmares regarding prior traumatic events. He avoids stimulus that would trigger him into those events. He dissociates — all of this is the criteria for post-traumatic stress." Id. at 22.
 {¶ 65} Ms. Kerr also testified: "The dissociative disorder, [D.W.] does zone out in trance like states quite frequently. Not as much since he's learned how to ground himself. That's in response to any kind of emotional distress or cues or triggers that are traumatic *Page 24 
to him." Id. at 23. Additionally, Ms. Kerr stated that "[D.W.] does dissociate a lot of information, so he has trouble remembering day-to-day activities and what he's done. So things that have happened to him he can talk about one day, the next day he denies that it has happened or feels like people are accusing him of something he didn't do when actually he did he's just not remembering it." Id. at 24.
 {¶ 66} Although Ms. Kerr testified that D.W.'s clinical presentation was related to trauma, Ms. Kerr also testified that "[w]e haven't really been able to get to [what the trauma is]. We've had two sessions where he's talked about specific incidences of being beat by his dad. There is significant more trauma there, but because of his reactivity and his emotional state we haven't gone there yet. He needs to get more stable before he can do that trauma work." Id.
 {¶ 67} When asked what needed to happen for D.W. to progress in treatment, Ms. Kerr testified without objection: "First and foremost he needs to feel safe in his environment. He needs to feel safe and secure in long term in his living arrangements to be able to lower the defense that he uses, which is the dissociation. * * * [A]nd then just consistent treatment with someone who's familiar with trauma and dissociative disorders." Id. at 26-27. When asked to estimate the anticipated length of treatment, Ms. Kerr testified, in part, that "[m]y best guess would be a couple of years or so; it's long term treatment for dissociative disorders. [D.W.] will dramatically improve though once he feels safe enough to start working on this stuff." Id. at 27. Ms. Kerr also opined that D.W. needs an established living situation. Id. Ms. Kerr testified that D.W. required a home environment that was "[l]ong term, secure, nurturing, understanding. [D.W.'s] behaviors could get worse when he does trauma work so the adults would need to be *Page 25 
understanding of that and try to learn what's going on with him so that they can be helpful instead of punitive." Id. at 29-30. When asked her recommendation to ensure that D.W. has a safe permanent home, Ms. Kerr testified: "I would like to see him living with someone who is kind and nurturing and knowledgeable about trauma and willing to keep him until he's an adult, and optimally with his sister because that's very important to him." Id. at 36.
 {¶ 68} Ms. Kerr also testified without objection that D.W.'s visitations with appellant had a negative impact upon D.W. Id. at 28. Ms. Kerr testified in part: "One week he will feel okay and think that the visits are great and wants to continue doing them particularly because he gets to see his sister at the same time. The next week he feels scared, concerned, worried, expresses a desire to stay living in his foster family. He expresses a lot of confusion about how he feels because it fluctuates." Id.
 {¶ 69} On direct examination, Ms. Kerr also testified as follows:
 Q. [by attorney Julie Murrell] Based upon your testimony that [D.W.] has experienced trauma at the hands of his father, would returning him to his father's home be re-traumatizing?
 A. [by Ms. Kerr] Yes.
 Q. And what effect would that have on — on [D.W.'s] treatment?
 A. It would stop any kind of effective treatment for him.
 Q. It would stop any kind of effective treatment?
 A. Yeah. [D.W.] would not be able to process prior traumas while living with his dad. He's triggered when he visits with his dad. He dissociates to get through the visit. Sometimes he remembers all of the visit, sometimes he only remembers parts of the visit, and again that part of the dissociative disorder. That would be worse if he lived with his dad *Page 26 
because it would be consistently triggering him, so his dissociation would be worse.
Id. at 38-39.
 {¶ 70} In addition to calling appellant, as on cross-examination, Ms. Evans and Ms. Kerr, FCCS also called Valerie Coman, a foster care therapist, to testify on its behalf. Ms. Coman testified that she had been M.W.'s foster care therapist for approximately eight months. (Tr., Apr. 25, 2007, at 84.) On direct examination, Ms. Coman testified that M.W. exhibited symptoms consistent with Post-Traumatic Stress Disorder ("PTSD") and Disruptive Behavior Disorder NOS (Not Otherwise Specified). Id. at 88. Ms. Coman testified that M.W. has difficulty verbalizing her feelings and, when she becomes scared or upset, she cries, withdraws, and becomes non-verbal. Id. at 90. Ms. Coman discussed M.W.'s gains in treatment, including an increased trust that adults in her life would keep her safe. Id. at 91-92. Ms. Coman testified that during therapy, M.W. had stated that "things" were not always safe at her father's house, and she also discussed concerns about appellant's anger and her brother's safety. Id. at 93. According to Ms. Coman, for M.W. to maintain the gains she has made in treatment, she would "[need] to continue to be in a stable, and therapeutic environment that is safe." (Tr., Apr. 25, 2007, at 97.)
 {¶ 71} In support of its case, FCCS also called Kelly Wigton-Schultz, the lay guardian ad litem for M.W. and D.W., and a licensed social worker who is employed by the Franklin County Public Defender's Office, to testify on FCCS's behalf. Id. at 115. Ms. Wigton-Schultz testified that the guardian ad litem had recommended the grant of permanent custody in favor of FCCS. Id. at 118. Ms. Wigton-Schultz also testified that she had reviewed the children's placement history; visited the children in their foster home *Page 27 
placements; had spoken with M.W.'s therapists; and that either she or the former guardian ad litem had spoken with D.W.'s therapist. Id. at 119. Ms. Wigton-Schultz also testified about her contact with the children's mother and with appellant. Id. at 119-121. According to Ms. Wigton-Schultz, prior to the children's removal from appellant's home she had a "relatively civil" relationship with appellant, "but once the children were removed in 2004, he would refuse to speak to me, would get very agitated with me, cursed at me, I don't know if I would go as far as to say threaten me, but I felt threatened and would — I would keep my distance after that point at hearings, cause obviously I was recommending that the children stay out of the — out of his care, which made him very angry." Id. at 123.
 {¶ 72} Ms. Wigton-Schultz testified that both children had an understanding of the proceedings, although, she thought D.W. had a better understanding than M.W. Id. at 127. According to Ms. Wigton-Schultz, D.W. stated that he preferred going home with appellant and did not want to be adopted. Id. at 128. However, according to Ms. Wigton-Schultz, M.W. was happy to stay in her current foster home and had stated she would like to be adopted by her foster family. Id.
 {¶ 73} Ms. Wigton-Schultz testified that she believed it was in the children's best interest to be permanently committed to FCCS for purposes of adoption. Id. at 140. Ms. Wigton-Schultz further testified that she understood that both foster homes "[were] willing to keep the children long term, whether it's through adoption or, you know, just maintaining the placement, but both are willing to keep the kids long term." Id. Ms. Wigton-Schultz also testified that appellant had not effectively addressed mental health and anger management issues and was unable to provide the children with a stabile, *Page 28 
consistent, and worry-free home environment. Id. at 140-142. Also, according to Ms. Wigton-Schultz, the children's mother had abandoned the children. Id. at 141-142.
 {¶ 74} In support of its case, FCCS also called John Brunton, a behavioral specialist and case manager at Beatty Park Elementary School, a Columbus public school, to testify on its behalf. According to Mr. Brunton, as part of his duties as a behavioral specialist, he is required "to do physical controls" on students and is required to respond to every crisis situation in the school building and, as a case manager, is responsible for behavior plans and "IEPs" ("Individualized Education Programs") for every student in the school. Id. at 160-162.
 {¶ 75} Mr. Brunton testified that D.W. is a fifth grade student at Beatty Park Elementary School, a school for emotionally disturbed students. Id. at 162-163. Mr. Brunton testified that D.W. had done well at Beatty Park Elementary School and, as a result, consideration had been given to transferring him to another room. Id. at 164-165. As part of this process, however, the school required the approval of either appellant or D.W.'s mother. Id. at 165. Consequently, Mr. Brunton sent a notice to appellant wherein he invited appellant to an IEP meeting. Id. at 166.
 {¶ 76} According to Mr. Brunton, in response to his letter, appellant called Mr. Brunton and informed him that he was unable to attend the meeting at the scheduled time. Id. at 166. Consequently, Mr. Brunton arranged to meet appellant on a Saturday morning; however, appellant failed to attend this meeting and failed to contact Mr. Brunton about his absence. Id. at 167, 168-169. During the week following the missed appointment, Mr. Brunton unsuccessfully attempted to contact appellant. Id. at 168. Mr. *Page 29 
Brunton also testified that D.W.'s classroom teacher was also unsuccessful in attempting to contact appellant about an annual review concerning D.W. Id. at 169-170.
 {¶ 77} After reviewing the evidence, we conclude that the evidence, if believed by the trial court, reasonably supports the trial court's finding that by clear and convincing evidence all parental rights and privileges should be terminated and permanent custody should be granted to FCCS. Because some competent, credible evidence supports the trial court's judgment, we overrule appellant's third assignment of error. SeeIn re Siders, supra, citing In re Brofford, at 876-877; In reHiatt, supra (stating that "[a]n appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence").
 {¶ 78} Appellant's fourth assignment of error asserts that the trial court violated appellant's right to be present when it proceeded without him on the last day of the hearing.
 {¶ 79} It is well-recognized that a parent must be afforded every procedural and substantive protection that the law allows before parental rights may be terminated. In re J.Z., supra, at ¶ 9; In reHayes, supra, at 48, quoting In re Smith, at 16. Moreover, "[d]ue process includes a hearing upon adequate notice, assistance of counsel, and under most circumstances, the right to be present at the hearing."In re J.Z., at ¶ 9, citing In re Thompson (Apr. 26, 2001), Franklin App. No. 00AP-1358.
 {¶ 80} On February 7, 2007, appellant's counsel, Victor Merullo, was unable to attend the permanent custody hearing due to a jury trial in which he was involved. Appellant also was not present at this hearing. Nevertheless, in their absence, Roger Koeck, another attorney from Mr. Merullo's office, represented appellant and appeared on *Page 30 
Mr. Merullo's behalf. A motion was made to continue the matter until April 25, 2007. The trial court granted the motion and continued the matter.
 {¶ 81} On April 25, 2007, however, claiming, among other things, that appellant was in Delaware County, Ohio, with a crew of workers and unable to promptly attend the hearing, and that he was unaware that the hearing was scheduled for that day, Mr. Merrullo orally moved for a continuance to delay the hearing so that appellant could attend the hearing later that day. Alternatively, Mr. Merullo moved to reschedule the hearing. The trial court denied appellant's motions. (Tr., Apr. 25, 2007, at 4-6.)
 {¶ 82} Whether to grant or deny a continuance "is a matter that is entrusted to the broad, sound discretion of the trial judge." State v.Unger (1981), 67 Ohio St.2d 65, syllabus. "An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." Id. at 67. See, also, Juv.R. 23 (providing that "[continuances shall be granted only when imperative to secure fair treatment for the parties"); In re Shepherd (May 11, 1998), Highland App. No. 97CA941, citing In re Basco (May 7, 1997), Scioto App. No. 96CA2418 (observing that "abuse-of-discretion" standard of review "is equally applicable to proceedings in juvenile court and Juv.R. 23").
 {¶ 83} "The term `abuse of discretion' implies an unreasonable, arbitrary or unconscionable attitude." State v. Congrove, Franklin App. No. 06AP-1129, 2007-Ohio-3323, at ¶ 9, citing Dayton ex rel. Scandrickv. McGee (1981), 67 Ohio St.2d 356, 359. An unreasonable decision is one that is unsupported by a sound reasoning process. AAAA Enterprises, Inc.v. River Place Community Urban Redevelopment Corp. (1990),50 Ohio St.3d 157,161; see, also, Scandrick, at 359, citing Black's Law Dictionary (5 Ed.) (observing that "`[unreasonable' means `irrational'");Congrove, at ¶ 9. An arbitrary *Page 31 
attitude, on the other hand, is an attitude that is "`without adequate determining principle; * * * not governed by any fixed rules or standard.'" Scandrick, at 359, quoting Black's Law Dictionary (5 Ed.); see, also, Congrove, at ¶ 9.
 {¶ 84} When applying an abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court.Berk v. Matthews (1990), 53 Ohio St.3d 161, 169; Stockdale v. Baba,153 Ohio App.3d 712, 2003-Ohio-4366, at ¶ 54, citing Berk, at 169;Congrove, at ¶ 9.
 {¶ 85} "`There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.'" Unger, at 67, quoting Ungar v. Sarafite (1964), 376 U.S. 575,589, 84 S.Ct. 841, rehearing denied, 377 U.S. 925, 84 S.Ct. 1218.
 {¶ 86} In Unger, the Supreme Court of Ohio instructed:
 In evaluating a motion for a continuance, a court should note, inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case. See United States v. Burton [(C.A.D.C.1978), 584 F.2d 485, certiorari denied, 439 U.S. 1069, 99 S.Ct. 837]; Giacalone v. Lucas [(C.A.6, 1971), 445 F.2d 1238, certiorari denied, 405 U.S. 922, 92 S.Ct. 960].
Id. at 67-68.
 {¶ 87} In Am. Export Inland Coal Corp. v. Matthew Addy Co. (1925),112 Ohio St. 186, the Supreme Court of Ohio held: "The general rule that notice to an agent is *Page 32 
notice to his principal applies to the relation of attorney and client, and an attorney's notice or knowledge of facts affecting the rights of his client will be considered notice to the latter." Id. at paragraph two of the syllabus. Later, in Raible v. Raydel (1954), 162 Ohio St. 25,30, the Supreme Court of Ohio also remarked that "[n]otice to the attorney of a party to a legal proceeding respecting matters arising and orders made during the course of litigation is generally imputable to such party."
 {¶ 88} In Raible, the Supreme Court of Ohio quoted with approvalDillon v. Hawkins (1921), 147 Ark. 1, 6, 227 S.W. 758, wherein the Arkansas Supreme Court remarked: "`Ordinarily litigants appear by attorneys, who act for them. Litigants are therefore necessarily charged with any knowledge possessed by their attorneys in regard to the orders of the court relating to the trial of the causes, and Dillon must therefore be charged with the knowledge of his local attorney, although that attorney had failed to communicate the knowledge to him.'"Raible, at 30.
 {¶ 89} Here, at the February 7, 2007 hearing, appellant was represented by Roger Koeck. At the hearing, Mr. Koeck received notice of the April hearing date. Applying Raible, the trial court reasonably could have charged appellant with the knowledge of his counsel regarding the hearing date of April 25, 2007, when it denied his motion for a continuance. See Raible, at 30. Under such circumstances, we therefore cannot find that the trial court acted unreasonably, arbitrarily, or unconscionably by denying appellant's motion for continuance. We therefore cannot conclude that the trial court abused its discretion by overruling appellant's motion for a continuance.
 {¶ 90} Moreover, at the hearing on April 25, 2007, after FCCS presented its casein-chief, when asked whether appellant had evidence to present, instead of moving again *Page 33 
for a continuance or claiming prejudice due to appellant's absence, Mr. Merrullo, his attorney, informed the court: "I was going to recall [appellant], but unfortunately under the circumstances, he's not able to make it here today. However, I reviewed my notes and I see that [appellant] did testify under cross-examination and the areas that he testified covered the areas which I would have probably asked him questions on today. And so I really have no other witnesses." (Tr., Apr. 25, 2007, at 185.) Accordingly, whether appellant's absence prejudiced his ability to proffer additional testimonial evidence is certainly arguable.[3]
 {¶ 91} For the reasons set forth above, we therefore overrule appellant's fourth assignment of error.
 {¶ 92} Accordingly, having overruled all four of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.
Judgment affirmed.
McGRATH and TYACK, JJ., concur.
[1] No father's name is recorded on either of the children's birth certificates. At the time of D.W.'s birth, appellant lived with D.W.'s mother, but they were not married. (Tr., Oct. 30, 2006, at 11.) Although appellant offered to submit to genetic testing to establish his parentage of D.W., such testing was not performed. Id. at 12-13. Genetic testing, however, was performed to determine whether appellant was the biological father of M.W. The results of this testing showed that appellant was not M.W.'s biological father. Id.
At trial, the parties proceeded as if there was no distinction between appellant's legal relationships with D.W. and M.W. For purposes of this appeal, appellant asks this court to proceed in a similar fashion.
[2] Although the trial court found Ms. Kerr to be an expert, the trial court nevertheless stated in part: "I'll consider Ms. Kerr an expert; however, the reservation could be is that if — if she is asked to render an opinion for something with which there's some question about her expertise feel free to object and I'll consider it more specifically at that time." (Tr., Nov. 28, 2006, at 19.) At the hearing, although Ms. Kerr was found to be an expert, she also appeared to testify as a lay witness when she discussed her treatment of D.W. without objection.
[3] But, see, Tr., Apr. 25, 2007, at 213. In closing argument, appellant's attorney stated to the court that he was unaware of Mr. Brunton's anticipated testimony and, as a consequence, appellant did not have an opportunity to rebut Mr. Brunton's testimony at the hearing. *Page 1