OPINION
{¶ 1} Appellant, "A.D." appeals from the permanent custody hearing held by the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch (beginning on February 28, 2005 and concluding on March 2, 2005), and the March 15, 2005 judgment entry in which the court granted permanent custody of her child, "M.R.D.," to Franklin County Children Services. Appellant asserts the trial court committed four errors and, therefore, its judgment should be reversed. For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} Two days after M.R.D.'s birth, hospital staff notified Franklin County Children Services (hereafter "FCCS") of her dependency. Hospital staff reported that A.D. (mother) had frequent grand mal seizures and could not be left alone with the child. The hospital also indicated that the father, "T.A.," was an admitted alcoholic who had come to the hospital to visit while intoxicated. Neither parent was employed at the time. It was later discovered that A.D. had five other children who were no longer in her custody. Within one month of her birth, FCCS placed M.R.D. in foster care.
 {¶ 3} On August 29, 2003, FCCS filed a complaint in the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, alleging M.R.D. was a dependent child. The complaint alleged M.R.D. lacked "adequate parental care by reason of the mental or physical condition of the child's parents[.]" At the time of the complaint, M.R.D. was approximately six months in age and had been in foster care for slightly more than five months.
 {¶ 4} On September 2, 2003, a hearing was held before a magistrate. The magistrate held that FCCS should maintain temporary custody of M.R.D., but should also allow the parents weekly supervised visits with the child. The magistrate found that placement of M.R.D. with her parents was contrary to her welfare and that FCCS had made reasonable efforts to keep M.R.D. with her parents. Further, the magistrate ordered a psychological exam of A.D., and a drug/alcohol assessment of T.A. The court adopted the magistrate's decision as its own.
 {¶ 5} The court adopted a case plan for the family in December 2003. The case plan indicated that, within the family, FCCS had concerns regarding M.R.D.'s age and inability to protect herself; A.D.'s lack of concern for her other children; the limited parenting skills and knowledge of both A.D. and T.A.; the parents' lack of social connectedness; the low economic resources of the family; A.D.'s medical condition; and T.A.'s drug and alcohol problems. The case plan required the parents to maintain safe and stable housing, maintain an adequate income, complete parenting classes, and be able to provide for M.R.D.'s basic needs. Further, the case plan required T.A. to declare paternity; remain drug and alcohol free; drop urine screens upon request; complete a drug/alcohol assessment; complete a psychological assessment; and follow through on all treatment recommendations resulting from either assessment. A.D. was required to seek medical treatment for controlling her seizures; see a neurologist for evaluation on a consistent basis; take any medication prescribed to help her seizures; complete a psychological assessment; and follow through with any recommendations made by the psychologist, including the taking of medication.
 {¶ 6} A report from an FCCS review in January 2004 indicated both parents were having difficulty complying with the case plan. The report states that, after both parents had missed two appointments, neither parent had obtained a psychological assessment; T.A.'s whereabouts were unknown and he had not completed his drug/alcohol evaluation or any other portion of the case plan; and A.D. was still having seizures (two of which caused her to drop M.R.D. during scheduled visits). The case worker concluded A.D. was attempting to follow the case plan, however, T.A. was not making any effort.
 {¶ 7} On March 19, 2004, FCCS moved for permanent custody of M.R.D. pursuant to R.C. 2151.413. M.R.D. was just over one year old at the time. Attached to the motion was the affidavit of FCCS case worker Dona Robertson. Robertson testified that it was in the best interest of the child to have parental rights terminated. Robertson further testified that A.D.:
* * * [H]as failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home; the parent failed to utilize psychiatric, psychological, or other resources that were made available to the parent for the purpose of changing parental conduct to allow the parent to resume and maintain parental duties. She has failed to complete a psychological evaluation and obtain employment. Mother has a physical disability that is so severe that it makes her unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds a permanent custody hearing. * * *
The case worker further testified that T.A.:
* * * [H]as demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. Father has not visited with this child since August of 2003. He has abandoned this child. Father has failed to establish paternity, follow the recommendation of a drug and alcohol assessment and complete a psychological evaluation.
 {¶ 8} A report from a review by FCCS in August 2004 indicated A.D. had completed parenting classes and undergone surgery to minimize her seizures; however, she still did not have independent housing and her seizures continued to occur. Additionally, A.D. had assaulted a woman while living at the YWCA. As a result of the assault, A.D. was psychologically assessed at Netcare and then hospitalized for four days for mental health concerns. T.A. reestablished contact with the case worker in April 2004 and completed several drug/alcohol screenings, but he failed to comply with the remainder of the case plan.
 {¶ 9} A report from an FCCS review in November 2004 showed A.D. had obtained independent housing. However, A.D. was hospitalized twice more for mental health concerns; once for 17 days and once for three days. During one of those visits, a full psychiatric evaluation was performed. A.D. was still experiencing seizures on a regular basis. T.A. had not obtained housing or completed any other items in the case plan.
 {¶ 10} A permanent custody hearing was held February 28 and March 2, 2005. Prior to hearing the merits of the matter, and with the concurrence of all counsel including counsel for A.D. and M.R.D.'s guardian ad litem, the trial court dismissed M.R.D.'s attorney as unnecessary. Thereafter, the court took testimony from Dona Robertson, Southeast case manager Bernard Williams, and A.D.A.D. was called to testify by FCCS. Upon prompting by the trial judge, the attorney stated she was calling A.D. "as if upon cross-examination." On March 15, 2005, the trial court issued a judgment entry granting permanent custody to FCCS and terminating all parental rights of both A.D. and T.A.
 {¶ 11} Appellant, A.D., asserts four assignments of error:
[I.] The trial court erred to the prejudice of the appellant by dismissing the previously-appointed counsel for the minor child[.]
[II.] The trial court committed plain error by permitting the appellee to compel the appellant to testify "as if upon cross-examination"[.]
[III.] The trial court's judgment terminating the appellant's parental rights was not supported by clear and convincing evidence[.]
[IV.] The trial court erred by terminating the appellant's parental rights where the undisputed evidence established that the appellee failed to make a reasonable effort to reunify the appellant with her child, and where the undisputed evidence establishes that the appellee did not attempt to find a suitable relative placement for the minor child[.]
 {¶ 12} Typically, we need not consider any claim regarding a particular error if that claim was not preserved by objection, ruling or otherwise in the trial court. Motorists Mut. Ins. Co. v. Hall, Franklin App. No. 04AP-1256, 2005-Ohio-3811. Not one of the five attorneys present at the permanent custody hearing on February 28, 2005, objected to the dismissal of M.R.D.'s attorney. In fact, all agreed, on the record, that an attorney in addition to the guardian ad litem was not necessary for M.R.D. Appellant's counsel was present and was in agreement. Therefore, appellant has waived this issue.
 {¶ 13} In some circumstances, the plain error doctrine can allow a court to address an issue that was otherwise waived. However, application of the doctrine is limited to exceptional circumstances. The Supreme Court of Ohio has held:
* * * [T]he plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself.
Goldfuss v. Davidson (1997), 79 Ohio St.3d 116, paragraph one of the syllabus. In this instance, the plain error standard cannot be met. We do not believe the action to have been in error. Even assuming dismissing M.R.D.'s attorney was in error, that error did not affect the process or its legitimacy in any way. M.R.D.'s interests were sufficiently represented, and she was too young to express a personal preference for placement. Assignment of error one is overruled.
 {¶ 14} Assignment of error two has also been waived by appellant. Appellant failed to object when FCCS called A.D. to take the stand and did not raise the issue at any other time in the trial court. Therefore, we need not address the issue. Moreover, the plain error doctrine does not apply in this instance. While many courts still follow the statutory practice found in R.C. 2317.07 of calling witnesses "as if upon cross-examination," Evid.R. 607 rendered that practice obsolete. Evid.R. 607 allows a party to call the opposing party as a witness, and to impeach that witness, on direct examination.[1] The court's inquiry into whether the witness was being called on "cross" or "direct" examination was therefore unnecessary. FCCS was free to call either parent in its case-in-chief.
 {¶ 15} Appellant asserts her Fifth Amendment privilege against self-incrimination was violated by her forced testimony for FCCS. We disagree. Appellant never asserted that privilege, or had any need to do so. Thus, the issue was waived. Moreover, this case is about dependency, not neglect. The parents have not been accused of any criminal behavior in relation to their child and nothing in the record suggests that there could be a valid assertion of the privilege. Assignment of error two is overruled.
 {¶ 16} We turn now to assignment of error three. A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. In reAndy-Jones, Franklin App. No. 03AP-1167, 2004-Ohio-3312. "Judgments supported by some competent, credible evidence going to all essential elements of the case" are not against the manifest weight of the evidence. Young v. Univ. of Akron, Franklin App. No. 04AP-318,2004-Ohio-6720, at ¶ 25, citing C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, paragraph one of the syllabus. We therefore must weigh the evidence in order to determine whether the trier of fact "`clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" Caldwellv. Ohio State University, Franklin App. No. 01AP-997, 2002-Ohio-2393, at ¶ 59, quoting State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 17} A judgment is not against the manifest weight of the evidence merely because inconsistent evidence was presented. State v. Raver,
Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. "`If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" Estateof Barbieri v. Evans (1998), 127 Ohio App.3d 207, 211, quoting 5 Ohio Jurisprudence 3d (1978) 192, Appellate Review, Section 603. Reversing a judgment on manifest weight grounds should only be done in exceptional circumstances, when "`the evidence weighs heavily against the [judgment].'" Thompkins, at 387, quoting Martin, supra.
 {¶ 18} In order to terminate parental rights, the movant must prove, by clear and convincing evidence, one of the four factors enumerated in R.C. 2151.414(B)(1) and that the child's best interests are served by a grant of permanent custody to FCCS. In re M.B., Franklin App. No. 04AP-755, 2005-Ohio-986. Clear and convincing evidence is that degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus. It is more than a mere preponderance of the evidence, but does not require proof beyond a reasonable doubt. Id.
 {¶ 19} R.C. 2151.414(B)(1) provides:
Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28
of the Revised Code or the date that is sixty days after the removal of the child from home.
In determining whether permanent custody is in the best interest of the child, R.C. 2151.414(D) states:
* * * [T]he court shall consider all relevant factors, including, but not limited to, the following:
(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 20} The factors set forth in R.C. 2151.414(E)(7) through (11) include: (1) whether the parents have been convicted of or pled guilty to various crimes; (2) whether medical treatment or food has been withheld from the child; (3) whether the parent has placed the child at a substantial risk of harm due to alcohol or drug abuse; (4) whether the parent has abandoned the child; and (5) whether the parent has had parental rights terminated with respect to a sibling of the child.
 {¶ 21} A trial court is not required to specifically enumerate each factor under R.C. 2151.414(D) in its decision. In re Heyman (Aug. 13, 1996), Franklin App. No. 96APF02-194. However, there must be some indication on the record that all of the necessary factors were considered. Id.; In re Hershberger Smith, Allen App. No. 1-04-55, 2005-Ohio-429, at ¶ 28. See, also, In re C.C., Franklin App. No. 04AP-883, 2005-Ohio-5163, at ¶ 53.
 {¶ 22} In its judgment entry, the court made several findings of importance to the inquiry now before us. First, the court found that "it is in the best interest of the child to permanently commit the child to Franklin County Children Services." Second, the court found M.R.D. had not been in the custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period. Third, the court found M.R.D. could not "be placed with either parent within a reasonable time or should not be placed with either parent in the foreseeable future." Those three findings encompass all the requirements of R.C. 2151.414(B)(1). We must now look at whether those findings were supported by some competent, credible evidence.
 {¶ 23} The trial court found that the child is not abandoned or orphaned or been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period ending on or after March 18, 1999. Based on A.D.'s participation in the hearing, her testimony, and her regular visits with the child, it is apparent that M.R.D. has not been abandoned. No testimony or argument indicated abandonment. It is also apparent from the dates contained in the record that M.R.D. had not been in FCCS custody for 12 or more months. All parties appear to agree on this fact. Therefore, some competent, credible evidence exists in the record as to both of those findings.
 {¶ 24} The court then found that the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. During the permanent custody hearing, Robertson testified that it is her belief that A.D. cannot currently parent the child and could not do so in the near future. Similarly, she further testified that T.A. could not care for M.R.D. now or in the near future. Southeast case manager Bernard Williams testified that A.D. may be able to care for a child in the future, provided she complied with her seizure medication as well as her psychotropic medication. However, he also indicated that A.D. had been refusing to take her psychotropic medication and, therefore, would continue to spiral downward. Williams indicated A.D. is currently in an intensive program with Southeast, and that that program does not allow a participant to have a child living with him or her. He did state a child may be permissible in other programs, but he also indicated A.D. was not yet ready for a less stringent program. Based on the testimony provided, there is some competent, credible evidence that placement with the natural parents was not possible at that time, or within a reasonable time therefrom.
 {¶ 25} The trial court then found that it was in the child's best interest to give permanent custody to FCCS. While the court did not specifically enumerate each factor under R.C. 2151.414(D) in its decision, there is some indication on the record that all of the necessary factors were considered.
 {¶ 26} First, M.R.D.'s interaction and interrelationship with her natural parents and foster parents were discussed during the hearing. Robertson testified that T.A. did not have a strong bond with M.D, possibly due in part to his infrequent visits. Further, it would take 20 to 30 minutes for M.R.D. to "warm up to" T.A. when he did visit. Robertson testified that M.R.D. is bonded to her foster mom and is developmentally on target. According to later testimony, M.R.D. has also bonded with A.D. and is comfortable and excited when around her. Robertson specified that M.R.D. calls both A.D. and the foster mom by their first names rather than by the term "mom." All of M.R.D.'s natural siblings live in other states and do not have interaction with A.D. or M.R.D.
 {¶ 27} Second, the guardian ad litem recommended that M.R.D. be placed in the permanent custody of FCCS. M.R.D. was too young to express her own wishes with regards to placement.
 {¶ 28} Third, the child's custodial history indicated she had spent nearly her entire life in foster care under the custody of FCCS. At no time was M.R.D. solely in her natural parents' care or custody.
 {¶ 29} Fourth, the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency was also discussed during the hearing. Robertson testified that it was her belief that A.D. cannot parent the child currently and could not do so in the near future. She testified that A.D. would require 24-hour supervision if she were to have M.R.D. in her care. Robertson further testified that T.A. similarly could not care for M.R.D. now or in the near future. The guardian ad litem indicated in his report that M.R.D. needs legally secure placement and that would best be achieved by granting permanent custody to FCCS.
 {¶ 30} Fifth, most of the factors contained in R.C. 2151.414(E)(7) through (11) do not apply to the case before us. There was some evidence at the hearing that A.D. may have had her parental rights terminated with respect to some of her other five children. A.D. testified she raised her first two sons until the age of eight. Once the boys reached eight years old, A.D. was unable to care for them because her severe seizures resulted in a year-long coma. At that point, the boys went to stay with one of A.D.'s cousins and have remained with the cousin since then (approximately 10 years). The other three children were apparently taken by children's services in Michigan. A.D. testified:
A. I don't know where my other children are. They got them from the hospital and didn't tell me where they were going.
Q. Who — who got them from the hospital?
A. Children Services.
* * *
Q. Okay. And you — and you've never seen them? And you've never provided care for those children?
A. [The] only thing that I provide — I provided — I brought baby things before they were born I — all the while they were in my stomach, I was rubbing and singing and praising God and letting them know that it's gonna be okay * * *[.]
(March 2, 2005 Tr. 24-25.) The record did contain evidence, by A.D.'s testimony, that at least three of A.D.'s six children had been involuntarily removed from her care.
 {¶ 31} Competent, credible evidence was presented for each of the factors enumerated in R.C. 2151.414(D). In addition, other competent, credible evidence was presented that supports a finding that permanent custody to FCCS was in the child's best interests. With respect to A.D.'s seizures, Robertson testified that, on at least one occasion, A.D. had dropped M.R.D. during a visit as the result of a seizure. A.D. herself testified to having had two seizures during a visit the day before her in-court testimony. A.D. attributed the seizures to a lack of medication at the time. Robertson was present during the visit and the seizures. She testified: 1) there was no warning that the seizures would occur; 2) she had to react quickly to assure M.R.D. was safe from A.D.; and 3) the incident was scary both for her and M.R.D.A.D. further testified that, even when she is taking her medication, she still has seizures, including one that lasted for 45 minutes. A seizure is often followed by a blackout period.
 {¶ 32} There is also competent, credible evidence in the record regarding A.D.'s mental health problems. Despite court orders to have a psychological examination, A.D. failed to do so until hospitalized for mental health concerns. Robertson testified that A.D. had been hospitalized four separate times during the past year for mental health concerns. One such stay lasted for nearly 2 months. During that time, A.D. was diagnosed as being bipolar. A.D. refused to take the prescribed medication. When asked about the diagnosis, A.D. denied having any mental health issues. She testified:
Q. Okay. What did he want to give you medication for?
A. Because he feels like I'm a bipolar person.
Q. And you don't agree with that?
A. I don't agree with that. It's where I mind my own business. I do not mind nobody else's business. I do not feel that I should worry about anybody else —
Q. Okay. So —
A. — but my children — [.]
(March 2, 2005 Tr. 28-29.) A.D. further testified that she only remembered one of the four hospital stays Robertson had testified to, and that her only health problem is her epilepsy. A.D. stated: "I'm not bipolar. I * * * am adjustability person and I am going to keep on saying that God is good." (March 2, 2005 Tr. 35.)
 {¶ 33} Some competent, credible evidence exists in the record to support each of the trial court's findings. While the record may also contain some contradictory evidence, we cannot say that the judgment is against the manifest weight of the evidence. Therefore, assignment of error three is overruled.
 {¶ 34} In assignment of error four, appellant alleges the trial court erred by terminating appellant's parental rights where the undisputed evidence established that appellee failed to make a reasonable effort to reunify appellant with her child, and where the undisputed evidence established that appellee did not attempt to find a suitable relative placement for the minor child. First, both parents have been largely unable to provide for M.R.D.'s basic needs. Both were living in temporary housing (including the YMCA or YWCA) or shelters for various periods of time. Neither was employed. A.D. was in and out of hospitals for her seizures and mental health issues. The FCCS case plan specifically required the parents be able to provide for M.D's basic needs. FCCS need not place a child into an unfit situation merely for the sake of attempting reunification. "The issue is not whether there was anything more that [the children's services agency] could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of this case." In re Ratliff, Franklin App. No. 04AP-803, 2005-Ohio-1301, at ¶ 36, citing In re Leveck, Hancock App. No. 5-02-52, 2003-Ohio-1269, at ¶ 10. The trial court found that "the Agency did reasonably identify and make available services to effectively address each of the family's problems which must be resolved in order to avoid placement or make it possible for the child to return home." We find the court's finding was supported by clear and convincing evidence.
 {¶ 35} Second, "the juvenile court is not required to consider placement with a relative prior to granting permanent custody." In reAndy-Jones, at ¶ 36. Even if consideration was required, FCCS had asked both parents for possible relatives that could care for M.R.D. Neither parent could provide any names. A.D. specifically testified that there were no relatives that could care for M.R.D., including her cousin who had taken her first two children. Additionally, FCCS independently attempted to determine where A.D.'s other children had been placed and to find relatives, but were unable to uncover any helpful leads. Assignment of error four is overruled.
 {¶ 36} Having overruled all of appellant's assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Bryant and Petree, JJ., concur.
[1] For more information on this topic, please see "Cross-examining adverse parties: Dead statutes haunt Ohio courts" by Judge Richard M. Markus as published in Ohio Lawyer magazine in the September/October 2004 edition.