OPINION *Page 2 
{¶ 1} These are consolidated appeals by appellants, E.S. and M.T., from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, in which that court (1) granted the motion of appellee, Franklin County Children Services ("FCCS" or "appellee"), for permanent court commitment ("PCC") of D.S., a minor child whose mother is E.S. and maternal grandmother is M.T.; and (2) denied M.T.'s motion for an order of legal custody.
 {¶ 2} D.S. was born on October 26, 2001, to E.S. and an unknown father, who has never been a party to these proceedings. D.S. was born with sickle cell anemia, a chronic and potentially life-threatening illness. E.S. was 14 years old when she gave birth to D.S. On February 22, 2002, M.T. filed a complaint alleging that E.S. was an unruly child and that D.S. was a dependent child. On April 16, 2002, the court awarded temporary custody of D.S. to M.T. On July 1, 2002, the court found D.S. to be a dependent child, awarded legal custody of the child to M.T., instituted court-ordered protective supervision by FCCS, and approved a case plan. On September 9, 2003, the court awarded M.T. legal custody of D.S. with continued protective supervision by FCCS.
 {¶ 3} On May 6, 2004, FCCS filed a motion alleging that D.S. had contact with James Tischner, a family friend and convicted sex offender. The next day, the court issued an order that D.S. was to have no contact with James Tischner. The court had also ordered that D.S. have no contact with M.T.'s boyfriend. On May 28, 2004, after an FCCS caseworker discovered M.T.'s boyfriend hiding inside M.T.'s home, the court placed D.S. in the temporary custody of FCCS. On December 2, 2003, the court terminated M.T.'s order of legal custody, and awarded legal custody of D.S. to FCCS. On *Page 3 
February 8, 2005, the court modified its orders to allow D.S. to stay overnight with M.T. one night per week, provided M.T. maintain telephone service to her home. However, because of a concern that M.T. had taken D.S. to James Tischner's home during her first overnight visit, on April 27, 2005, the court terminated D.S.'s overnight visits with M.T. and ordered that M.T. have no unsupervised contact with D.S.
 {¶ 4} On September 30, 2005, FCCS filed a motion seeking PCC, pursuant to R.C. 2151.414(B)(1)(d). On April 26, 2006, M.T. filed a motion for legal custody of D.S. Following a three-day trial that took place in February and March 2007, the trial court issued a decision and entry on May 14, 2007, in which it granted FCCS' motion for PCC and denied M.T.'s motion for legal custody. E.S. and M.T. instituted separate appeals. M.T. advances three assignments of error, as follows:
 Assignment of Error Number One: The trial court failed to address all of the statutory best-interests factors.
 Assignment of Error Number Two: The trial court's determination that it was in the child's best interests to grant the FCCS permanent custody, rather than the maternal grandmother, is not supported by clear and convincing evidence.
 Assignment of Error Number Three: The maternal grandmother was deprived of the effective assistance of counsel when her attorney agreed to a surprise witness.
 {¶ 5} E.S. advances three assignments of error, as follows:
 1. The trial court erred by granting permanent custody of the minor child to the appellee when it had failed to comply with R.C. 2151.414.
 2. The trial court erred by failing to grant Grandmother's Motion for Legal Custody as a less restrictive alternative to the granting of Permanent Custody. *Page 4 
 3. The trial court erred by failing to fully investigate the child's wishes to determine if there was a conflict between the GAL and the child before granting the motion for permanent custody.
 {¶ 6} In order to terminate parental rights, the movant must prove, by clear and convincing evidence, one of the four factors enumerated in R.C. 2151.414(B)(1) and that the child's best interest is served by a grant of permanent custody to FCCS. In re M.B., Franklin App. No. 04AP-755, 2005-Ohio-986. Pursuant to R.C. 2151.414(B)(1)(d), a court may grant permanent custody of a child to a public children services agency if the court determines at the hearing, by clear and convincing evidence, (1) that it is in the best interest of the child to grant permanent custody of the child to the agency, and (2) that the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22 month period.
 {¶ 7} Clear and convincing evidence requires that the proof "`produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" In re Estep (Feb. 8, 2001), Franklin App. No. 00AP-623, 2001 Ohio App. LEXIS 435, at *4, quoting In theMatter of Coffman (Sept. 7, 2000), Franklin App. No. 99AP-1376, 2000 Ohio App. LEXIS 4033, citing Cross v. Ledford (1954), 161 Ohio St. 469,120 N.E.2d 118, paragraph three of the syllabus. A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. In reAndy-Jones, Franklin App. No. 03AP-1167, 2004-Ohio-3312, ¶ 28, discretionary appeal not allowed, 103 Ohio St.3d 1429, 2004-Ohio-4524,814 N.E.2d 491. Judgments supported by some competent, credible evidence going to all essential elements of the case are not against the manifest weight of the evidence. Id.; CE. Morris *Page 5 Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 8 O.O.3d 261,376 N.E.2d 578, paragraph one of the syllabus.
 {¶ 8} The findings of a trial court are presumed correct since, as the trier of fact, it is in the best position to weigh the evidence and evaluate the testimony. In re Brown (1994), 98 Ohio App.3d 337, 342,648 N.E.2d 576; In re Hogle (June 27, 2000), Franklin App. No. 99AP-944. Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v.Cincinnati (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350. "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
 {¶ 9} No party disputes that FCCS met the second of the two elements under R.C. 2151.414(B)(1)(d), because D.S. had been in FCCS' temporary custody for the requisite time period. Thus, in deciding whether the motion for PCC should be granted, the trial court properly focused only on the best interest requirement. In re Damron, Franklin App. No. 03AP-419, 2003-Ohio-5810, ¶ 10.
 {¶ 10} In determining the best interest of the child, for purposes of a permanent custody motion, the court:
 * * * shall consider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; *Page 6 
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
R.C. 2151.414(D).
 {¶ 11} In support of her first assignment of error, M.T. argues that the trial court failed to consider the fifth enumerated best-interest factor, which requires consideration of whether any of the five factors in R.C. 2151.414(E)(7) to (11) apply. These factors are: (1) a parent has been convicted of or pleaded guilty to one of several enumerated felonies; (2) a parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food; (3) a parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times as required by a case plan; (4) a parent has abandoned the child; and (5) a parent has had parental rights involuntarily terminated with respect to a sibling of the child.
 {¶ 12} M.T. acknowledges that the court stated that the father had abandoned the child, but argues that because the court did not specifically mention or address any of the other R.C. 2151.414(E)(7) to (11) factors, we must reverse. More specifically, M.T. argues, "[although the trial court described the mother's difficulties with drugs, the court *Page 7 
never demonstrated that it considered that fact when analyzing best interests. As a result of this shortcoming, the judgment should be reversed and the case remanded for a new trial * * *" (Brief of M.T., 14.)
 {¶ 13} Though it is true that E.S. quit a Maryhaven substance abuse treatment program after only partially completing it, the record reveals that attempts to connect E.S. to another treatment program were ongoing at the time of trial. (Tr. Feb. 28, 2007, 53.) M.T. does not identify, and we cannot find any evidence in the record that E.S. "has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times." R.C.2151.414(E)(9). Given the dearth of evidence as to this factor, or as to any other factor required to be considered under R.C. 2151.414(D)(5) (except for the father's abandonment, which the court mentioned), the factors that the trial court failed to specifically mention did not apply in this case. It is not prejudicial for a court to fail to mention or consider factors that are irrelevant to the case at hand. In reHershberger, Allen App. No. 1-04-55, 2005-Ohio-429, ¶ 30. For this reason, M.T.'s first assignment of error is overruled.
 {¶ 14} In both M.T.'s second assignment of error and E.S.'s first and second assignments of error, the parties argue that the trial court's conclusion that PCC is in D.S.'s best interest is against the manifest weight of the evidence. Both parties maintain that it is in D.S.'s best interest to be in M.T.'s custody, the trial court should have granted *Page 8 
M.T.'s motion for legal custody, and it should have denied FCCS' motion for PCC. As such, we will address these three assignments of error together.[1]
 {¶ 15} We note initially that "the juvenile court is not required to consider placement with a relative prior to granting permanent custody."In re M.R.D., Franklin App. No. 05AP-324, 2005-Ohio-5705, ¶ 35, quotingIn re Andy-Jones, supra, at ¶ 36. "A trial court is not even required to find by clear and convincing evidence that a relative is not a suitable placement option." In re S.W., Franklin App. No. 05AP-1368,2006-Ohio-2958, ¶ 30, certiorari denied, Z W. v. Franklin Cty. ChildrenServs., 127 S.Ct. 1152, 166 L.Ed.2d 999, citing In re J.S., Franklin App. No. 05AP-615, 2006-Ohio-702, ¶ 34. Moreover, "in Ohio, `relatives seeking legal custody of a child are not afforded the same presumptive rights that a parent receives as a matter of law.'" (Citation omitted.)In re A.V., Franklin App. No. 05AP-789, 2006-Ohio-3149, ¶ 40, discretionary appeal not allowed, 111 Ohio St.3d 1471, 2006-Ohio-5625,855 N.E.2d 1259; In re Zorns, Franklin App. No. 02AP-1297, 2003-Ohio-5664, ¶ 28, discretionary appeal not allowed,100 Ohio St.3d 1547, 2003-Ohio-6879, 800 N.E.2d 752. Instead, the trial court has the discretion to determine whether to place children with a relative.In re S.W., supra, at ¶ 30. *Page 9 
 {¶ 16} In conducting its best-interest analysis, the trial court was required first to consider D.S.'s interaction and interrelationship with her mother, her relatives and her foster parents. The evidence showed, and the trial court acknowledged, that D.S. is bonded with M.T. The court also acknowledged that D.S. is bonded with E.S. and is affectionate toward her. However, Ms. Wolfe and FCCS community service worker Maria Kascor both testified that the bond between D.S. and E.S. is more akin to a sibling relationship than a mother-daughter bond. Ms. Wolfe, the guardian ad litem, testified that D.S. is "very bonded" with her foster mother and that D.S. "is like part of the family."[2] D.S. calls her foster mother "Mommy" and refers to her foster siblings as her brothers and sisters. This factor weighs in favor of granting appellee's motion for PCC.
 {¶ 17} The next factor for the court to consider was D.S.'s wishes, as expressed directly or through the guardian ad litem. Ms. Wolfe testified that D.S. wishes to stay with her foster mother. Ms. Wolfe's report, filed with the trial court on November 27, 2006, also stated that D.S. wishes to continue living with her foster mother. This factor weighs in favor of granting appellee's motion.
 {¶ 18} The next factor for the court to consider is the custodial history of D.S. D.S. lived with M.T. for the first two and one-half years of her life. The court noted that M.T. told a hospital social worker that she and her friend, Roxy Piatt, equally divided caring for D.S. during this period. In May 2004, she was removed from M.T.'s custody, and since that time has been living with her foster mother. This factor weighs in favor of permanent custody. *Page 10 
 {¶ 19} The next factor to be considered is D.S.'s need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. FCCS supervisor Rucell Henderson testified, and no party disputes, that E.S. has not substantially complied with her case plan. Caseworker Monica Kagey testified that she did not have concerns about M.T.'s ability to take care of D.S. on a daily basis. However, she did not consider M.T. to be an appropriate, permanent placement for D.S. because: (1) M.T. had twice violated court orders to keep D.S. away from certain men in her life (her boyfriend and Mr. Tischner); (2) Ms. Kagey believed that M.T. had been untruthful about her relationship with her boyfriend (referring to him, at different times, as her friend, cousin, and boyfriend); and (3) M.T. had periodically had her natural gas or telephone service discontinued for failure to pay her bills. At the time of trial, M.T. testified that her utilities were all in service, but she was in arrears on her gas bill in the amount of $8,000.
 {¶ 20} D.S. has sickle cell anemia. Sandra Steiner, a clinical social worker at Nationwide Children's Hospital's Comprehensive Sickle Cell Program, testified that she assisted E.S. and M.T. after D.S. was diagnosed with the disease. This included assessment and education about what is required in order to properly care for a child with this chronic disease. Ms. Steiner testified that E.S. attended only one follow-up appointment with D.S. after the initial assessment. M.T. would attend more often, but would sometimes send Roxy Piatt and James Tischner on her behalf. M.T. told Ms. Steiner that Roxy Piatt took care of D.S. half of the time while D.S. was in M.T.'s custody.
 {¶ 21} Ms. Steiner testified that children with sickle cell anemia are at higher risk for infection due to a compromised immune system. As a result, these children must take *Page 11 
antibiotic medications twice daily from the age of two months to at least six years. She testified that the family of a sickle cell child must have a working telephone at all times because a sickle cell child who develops a fever due to an infection "can die within a matter of hours if they're not treated properly with I.V. antibiotics." (Tr. Mar. 1, 2007, 95.) She further testified that ambient temperature can adversely affect a person with sickle cell anemia. Should there be no heat in a person's home, for instance, the lowered ambient temperature can cause a sickle cell crisis. (Id. at 96.) Moreover, if the utility used for cooking were turned off, this could cause a crisis if it compromised the caregiver's ability to provide the child with healthful foods. Sickle cell children need 24-hour supervision and the caregiver must be attentive to lethargy or fever, and changes in the child's appearance, such as skin tone, eye color, and the color of the child's gums.
 {¶ 22} Ms. Kagey testified that, at the suggestion of M.T., FCCS investigated whether D.S.'s maternal aunt, a distant cousin, or family friend Roxy Piatt were suitable alternative placements for D.S., but none was approved. FCCS did not approve the maternal aunt because she had a history of other cases with the agency, and her home was dirty and overcrowded with five other children. The agency did not approve the cousin because she suffered from mental disabilities severe enough that she receives Supplemental Security Income, and because she already had two other children who themselves had special needs. FCCS did not approve Ms. Piatt because she resided with James Tischner and because she had a history with the agency that included substantiated neglect of another child.
 {¶ 23} In this case, D.S. has been in the custody of FCCS for just over half of her life, and is strongly bonded with her foster family. She suffers from a chronic, potentially *Page 12 
life-threatening illness that requires constant, consistent supervision and an environment that does not pose the risk of inducing a health crisis. The guardian ad litem opined that PCC would be in D.S.'s best interest. D.S. is clearly in need of a legally secure permanent placement and, in consideration of the entire record, the evidence supports the trial court's conclusion that a legally secure permanent placement can only be achieved through a grant of permanent custody. This factor weighs in favor of permanent custody.
 {¶ 24} The next factor to be considered is whether any of the factors in R.C. 2151.414(E)(7) to (11) apply. As discussed earlier, the only factor applicable in this case is that the unknown father of D.S., who is not a party to these proceedings, has abandoned her.
 {¶ 25} The record supports the trial court's conclusion that PCC is in D.S.'s best interest and contains competent, credible evidence going to all essential elements of the motion for PCC. Moreover, it was not abuse of discretion for the court to deny M.T.'s motion for legal custody. Accordingly, M.T.'s second assignment of error, and E.S.'s first and second assignments of error are overruled.
 {¶ 26} In support of M.T.'s third assignment of error, she argues that she received ineffective assistance of counsel when her attorney agreed to allow Rucell Henderson, the supervisor of a former caseworker assigned to the family, to testify in place of the former caseworker herself (who is no longer employed by FCCS and has moved out of state). Initially, M.T.'s counsel objected to FCCS calling Ms. Henderson to testify, on the grounds that she was a surprise witness. However, following a discussion off-the-record with the court and counsel, M.T.'s counsel agreed to allow Ms. Henderson to testify, so *Page 13 
long as she limited her testimony to facts that occurred during the time period that the former caseworker was actually assigned to D.S.'s case.
 {¶ 27} To prove ineffective assistance of counsel, the party must show that counsel's performance was deficient. Strickland v. Washington
(1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed a defendant by theSixth Amendment to the United States Constitution. Id.
 {¶ 28} The party must then show that counsel's deficient performance prejudiced her. Id. The party must demonstrate a reasonable probability that a different result would have been returned but for counsel's deficiencies. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "Prejudice" exists only when counsel's performance renders the result of the trial unreliable or the proceeding unfair. Id.
 {¶ 29} "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686. A party's failure to satisfy one prong of the Strickland test negates a court's need to consider the other. Id. at 697.
 {¶ 30} "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. A properly licensed attorney is presumed competent, and the burden of proving ineffectiveness is on the party asserting it. State v. Smith (1985), 17 Ohio St.3d 98, 100, 17 OBR 219,477 N.E.2d 1128. Thus, counsel's actions that "might be considered sound *Page 14 
trial strategy" are presumed effective. Strickland, supra, at 689. Furthermore, counsel need not raise meritless issues. State v. Hill
(1996), 75 Ohio St.3d 195, 661 N.E.2d 1068.
 {¶ 31} M.T. argues that counsel's agreement regarding the testimony of Ms. Henderson was prejudicial because if her counsel had not agreed to this witness, FCCS would have been forced to produce the former caseworker to testify about M.T.'s financial situation, housing, and relationship with James Tischner. M.T. also maintains that, given that the former caseworker would have had first-hand knowledge of these topics, that witness represented M.T.'s best opportunity to corroborate her own version of these events.
 {¶ 32} First, as appellee correctly points out, "there is no requirement that disclosures or witness lists be updated pursuant to Juv.R. 24." In re J.L., Cuyahoga App. No. 84368, 2004-Ohio-6024, ¶ 25, discretionary appeal not allowed, 104 Ohio St.3d 1463, 2005-Ohio-204,821 N.E.2d 578. If she desired current information at the time of trial, M.T. should have repeated her discovery request closer to trial, or moved for an order compelling discovery. Id.; see, also, In re JeremyK (July 27, 2001), Erie App. No. E-00-051; In re Funk, Portage App. No. 2002-P-0035, 2002-Ohio-4958. "Absent a motion to compel, the trial court in juvenile proceedings does not abuse its discretion in admitting evidence not previously disclosed by the state." Id., quoting In reGilbert (Sept. 28, 1987), Butler App. No. CA86-10-144, 1987 Ohio App. LEXIS 8876, at *11.
 {¶ 33} Moreover, we note that if M.T. wished to call the former caseworker to corroborate her own testimony, she could have produced the witness herself. Juv.R. 17(A)(2). Though M.T. does not allege that counsel's failure to subpoena the caseworker constituted ineffective assistance, we note that, "[i]n general, decisions to call witnesses *Page 15 
are within the purview of defense counsel's trial strategy. Absent a showing of prejudice, we will not consider such decisions as deficient performance." State v. Mathias, Franklin App. No. 06AP-1228,2007-Ohio-6543, ¶ 36, citing State v. Dennis, Franklin App. No. 04AP-595, 2005-Ohio-1530, ¶ 22.
 {¶ 34} Finally, Ms. Henderson indeed limited her testimony to events occurring during the time that the former caseworker was assigned to the case, and M.T. had an opportunity to cross-examine her as to which of her factual statements were taken from the FCCS case file, as opposed to those taken from her own experience with the case. For all of these reasons, we perceive no prejudice in counsel's decision to acquiesce to FCCS calling Ms. Henderson to testify. Accordingly, M.T.'s third assignment of error is overruled.
 {¶ 35} In support of her third assignment of error, E.S. argues that the trial court had a duty to further investigate D.S.'s wishes, beyond hearing testimony from the guardian ad litem. The guardian at litem, Carrie Wolfe, testified that she first met D.S. in 2003 and has visited with her 16 or 17 times. Visits have taken place in M.T.'s home, in the foster home and at FCCS' offices. Ms. Wolfe testified that she has asked D.S. what adoption means, and that the child gave a responsive answer that was as accurate as one could reasonably expect from a five-year-old. E.S.'s counsel then asked whether Wolfe had "gauge[d] [D.S.'s] reaction to her grandmother not being in her life" and Ms. Wolfe answered in the negative.[3] E.S. argues that this triggered a duty on the trial court's part to investigate further whether D.S. understood that PCC meant her grandmother *Page 16 
would have no legal right to see her, and whether D.S.'s wishes were expressed with full knowledge of the consequences of PCC.
 {¶ 36} Pursuant to R.C. 2151.414(D)(2), the court must take into account "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child" in determining whether PCC is in the child's best interest. "The statute unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem." In re CF., 113 Ohio St.3d 73, 2007-Ohio-1104,862 N.E.2d 816, ¶ 55. "The trial court has discretion to accept the testimony of the guardian ad litem on the child's wishes rather than hearing a direct expression of those wishes made by the child." Id. at ¶ 56. The trial court's decision in this regard should not be reversed unless "the court acted in an unreasonable, arbitrary, or unconscionable manner." Id.
 {¶ 37} The statute states that the trial court must take into account "the child's wishes" but is silent as to whether this means the child's wishes as to his or her placement, or the more specific issue of termination of parental rights. This court has interpreted the statute to refer to the child's wishes as to placement. See, e.g., In reJ.W., Franklin App. No. 06AP-864, 2007-Ohio-1419, ¶ 20-21, discretionary appeal not allowed, 114 Ohio St.3d 1512, 2007-Ohio-4285, 872 N.E.2d 952;In re Brooks, Franklin App. No. 04AP-164, 2004-Ohio-3887, ¶ 48, discretionary appeal not allowed, 103 Ohio St.3d 1495, 2004-Ohio-5605,816 N.E.2d 1081. *Page 17 
 {¶ 38} Ms. Wolfe testified that "[D.S.] knew that adoption meant that she would live with Ms. Bobbie forever."[4] The record sufficiently establishes that five-year-old D.S. wishes to stay with her foster mother "forever" and that she understands the meaning of being adopted. On the record before us, we find that the trial court satisfied its statutory duty under R.C. 2151.414(D), and properly exercised its discretion to consider the wishes of the child expressed through her guardian ad litem. Accordingly, E.S.'s third assignment of error is overruled.
 {¶ 39} Having overruled all of M.T.'s and E.S.'s assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.
Judgment affirmed.
 PETREE and KLATT, JJ., concur.
[1] E.S. also argues that PCC should have been denied because M.T. completed her case plan and E.S. completed some aspects of her case plan, and FCCS did not make sufficient attempts to reunify the family. "However, R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan." In re Brooks, Franklin App. No. 04AP-164, 2004-Ohio-3887, ¶ 62, discretionary appeal not allowed, 103 Ohio St.3d 1495, 2004-Ohio-5605, 816 N.E.2d 1081. R.C.2151.414(E)(1) specifically requires an inquiry into the degree of the parents' compliance with the case plan, for purposes of determining whether the child cannot be placed with either parent within a reasonable time, or should not be placed with the parents. However, R.C.2151.414(E) is not implicated in this case because the filing of a permanent custody motion based on R.C. 2151.414(B)(1)(d) does not trigger it. Id. at ¶ 53. Moreover, we have held that, though an agency's efforts to reunify the family may be relevant to the decision whether to grant PCC in some cases, there is no language in R.C. 2151.414
explicitly requiring a trial court to make a finding that an agency such as FCCS demonstrated a "good faith effort" toward reunification. In reRudolph (June 19, 2001), Franklin App. No. 00AP-1263.
[2] Tr. Mar. 2, 2007, 32.
[3] Tr. Mar. 2, 2007, 60.
[4] Id. *Page 1